# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

| | | |
|---|---|---|
| HELEN CLIFFORD, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No: 3:10 CV 221 |
| | ) | |
| STATE FARM FIRE AND CASUALTY | ) | |
| INSURANCE COMPANY, | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

In this case, the plaintiff's house caught fire and, in processing her claim, her insurance company investigated the possibility that she procured arson of her house. While the investigation was underway, plaintiff Helen Clifford ("Clifford") filed a complaint against defendant State Farm Fire and Casualty Insurance Company ("State Farm") listing claims of breach of contract, failure to maintain good faith, bad faith, and agent's neglect and misrepresentation. (DE # 1.) After the complaint was filed, State Farm concluded that Clifford had procured arson of her house and denied her claim. State Farm has filed a motion for partial summary judgment arguing that Clifford does not have evidence to support her claims of bad faith and failure to maintain good faith or to recover punitive damages or attorney fees. (Def.'s Mot. for Partial Summ. J. DE # 11; Def.'s Br. in Supp. of Mot. for Partial Summ. J., DE # 12.) Clifford has filed a response (Pl.'s Mot. in Opp'n to Partial Summ. J. DE # 21; Pl.'s Mem. in Opp'n to Partial Summ. J., DE # 22) and State Farm has filed a reply. (Def.'s Reply, DE # 24.)

# I.    FACTUAL BACKGROUND

## A.    *The parties*

Plaintiff Clifford is a single mother with two children. She is the owner of a residence located at 1951 North 400 East in Winamac, Indiana ("Clifford's house."). Clifford had an insurance policy on the house with defendant State Farm.

## B.    *The fire*

Clifford's house caught on fire on October 7, 2008. The Monterey Assistant Fire Chief Steve Shank ("Shank"), who happened to be near the house at the time, reported the fire at 11:03 a.m. (Clifford Claim File 286, 325, Def.'s Exh. A to Mot. for Partial Summ. J., DE ## 12-1 - 12-5.) Shank was driving past the home when he noticed smoke venting from the south second floor windows and he called Pulaski County Dispatch to notify them of the event. (*Id*. at 286.) When Shank first spotted the fire he was about a quarter mile away from Clifford's house and he did not see any other traffic around. (Steve Shank Dep. 28, Pl.'s Exh. 29 to Mem. in Opp'n to Mot. for Partial Summ. J., DE # 23-29.) Shank approached the home in about two to three minutes, knocked on the door, and forced his way in when he got no response. (*Id*. at 31; Clifford Claim File 286.) He searched the main floor and did not find any occupants. (*Id*.) He walked past the stairway to the second floor, noticed flames moving down the steps towards him, and thought that movement seemed unnatural. (*Id*. at 286-87.) When he exited the home, Shank found a red plastic container, that looked like a gasoline container, near the east door of the residence. (*Id*. at 287.) He removed the container from the porch to the yard

southeast of Clifford's house. (*Id.*) He observed that the entire interior of the house became fully engulfed very quickly. (*Id.*)

The fire department did not find any evidence indicating any kind of forced entry into the home prior to the fire. (*Id.*) About ten minutes after Shank reported the fire, another person, later identified to be Romel Scholz, called 911. (*Id.*) She reported that she had observed a tall, thin male, dressed in a hooded sweatshirt, leaving Clifford's house just prior to flames emerging from the south second floor windows. (*Id.*) She reported that the man had gotten into a maroon van.[1] (*Id.*)

C.      *Monterey Tippecanoe Volunteer Fire Department report*

The Monterey Tippecanoe Volunteer Fire Department Fire Chief, Ken McClure, completed a form, dated October 18, 2008, about the fire. (Pl.'s Exh. 5, DE # 23-5.) The report stated that the item and material contributing most to the fire were "undetermined." (*Id.*) It stated that the cause of the fire was "under investigation." (*Id.*) The report concluded that the Monterey Tippecanoe Volunteer Fire Department's report would remain "[u]ndetermined and incomplete" until the department received the Fire Marshal's report. (*Id.*)

D.      *The Fire Marshal's report of fire investigation*

Frederick J. Sumpter ("Sumpter") of the Investigation Section of the Department of Homeland Security for the Indiana State Fire Marshal's Office, prepared a Report of

---

[1] Clifford contends that Scholz did not provide identifying information about the man or the van, but this assertion is not supported by the portion of the Fire Marshal's Report to which Clifford cites. (Pl.'s Mem. 5; Pl.'s Exh. 7, DE # 23-7 at 10.)

Fire Investigation ("Fire Marshal's report") with the assistance of members of the

Monterey Fire Department and the Pulaski County Sheriff's Department. (Clifford

Claim File 282.) The report, dated December 19, 2008, identified several large,

unconnected lines of demarcation on the south side of the residence and around the

south second floor window along the east side of Clifford's house. (*Id.* at 288-89, 390.)

The report found that "[e]vidence was identified indicating that an ignitable liquid has

been poured on the floor prior to ignition of the flames." (*Id.* at 386.) It also stated:

> Evidence was identified that the ignitable liquid had been "trailed" into
> the northeast bedroom of the first floor. This "trailer", a vehicle used to
> increase the spread of flames along the floor, was identified extending
> through the doorway, through the center portion of the bedroom and
> terminating near the north end of the room.

(*Id.*) Evidence also showed that an ignitable liquid had been poured in the kitchen and

trailed to the living room. (*Id.* at 387.) It also stated that there was evidence of the liquid

having pooled on the floor. (*Id.* at 386-89.) The charring from the fire was identified as

"extending unnaturally downward where the ignitable liquid had soaked through" the

carpet and the flooring. (*Id.* at 386.)

The report stated that the occupant, Clifford, stated that she had not been in the

residence since October 6, 2008, and that there was an electrical problem inside the

residence. (*Id.* at 286.) It stated that she described the problem as the kitchen fan going

on and off and that she did not provide any evidence that the problem had been

examined by an electrician. (*Id.*)

The Fire Marshal's report concluded: "Based on these facts this fire was determined to be incendiary." (*Id.* at 390.) It stated that the fire originated from the floors in the living room, the northeast first floor bedroom, the kitchen, the stairway to the second floor, and the second floor bedrooms. (*Id.*) It stated that evidence showed that an ignitable liquid had been poured on the floor in these rooms prior to ignition of the flames. (*Id.*) The report stated that all accidental causes for the fire were eliminated and it identified a possible motive for the fire as "[i]nsurance [f]raud." (Clifford Claim File 283.) The report also stated that the laboratory results from samples from the house secured by a private investigator for State Farm were negative. (*Id.* at 390.) It explained that the negative result did not rule out the presence of an ignitable liquid, it just failed to identify it. (*Id.*)

E.     *The policy*

On the date of the fire, Clifford's house was insured under a homeowner's insurance policy issued by State Farm. (Def.'s Exh. B, DE # 12-6.) Clifford's mother, Grace Clifford, was an additional insured under the policy. (Clifford Claim File 006.) Clifford was late paying her premium for September, 2008, and paid for September and October together on October 3, 2008, making a cash payment of $294.72 on her policy. (Pl.'s Exh. 18, DE # 23-18; Clifford Claim File 34.) If the premium had not been paid, Clifford's policy would have lapsed. (*Id.*)

The policy stated that it covered "accidental direct, physical loss to property." (State Farm Policy 7, Def.'s Exh B, DE # 12-6.) The policy also stated:

**Intentional Acts.** If you or any other person insured under this policy causes or procures a loss to property covered under this policy for the purpose of obtaining insurance benefits, then this policy is void and we will not pay you or any other insured for this loss.

(*Id.* at 15.)

The policy explained the insured's duties after a loss. (*Id.* at 13.) These duties included, providing, as often as State Farm reasonably required, records and documents that State Farm requested and submitting to statements and examinations under oath of the insured and members of the insured's household or any other people to extent that the insured had the power to do so. (*Id.*) The policy required the insured to submit a sworn proof of loss sixty days after the loss. (*Id.*)

Another provision of the policy stated:

**Concealment of Fraud.** This policy is void as to you and any other insured, if you or any other insured under this policy has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance, whether before or after a loss.

(*Id.* at 19.) The policy did not provide for the payment of attorney fees to the insured in the event of a dispute about the policy. (*Id.*)

F.   *State Farm's communications with Clifford after the fire*

The day after the fire, State Farm informed Clifford of Alternative Living Expense  coverage and told her close to that time it had advanced her $5,000 to buy food and clothes. (Clifford Claim File 34, 45; Helen Clifford Dep. 126-27, Def.'s Exh. C, DE # 13.) State Farm also gave Clifford $500 for first month's rent at her mother's house.

(Clifford Claim File 34, 45.) State Farm informed Clifford that it would be undertaking an investigation of the fire. (*Id.* at 34.)

On October 9, 2008, State Farm sent Clifford a letter setting out the coverages applicable to her loss and her responsibilities under the policy. (Clifford Claim File 810.) On October 13, 2008, Clifford signed a "Request for Claim Service and Non-waiver of Rights" form. (*Id.* at 816.) The form stated that the reason for this request was: "There is a question as to whether this fire is accidental as it relates to the insured." (*Id.*) The form included this statement:

> The undersigned request(s) and authorize(s) the Company to investigate, negotiate, settle, deny or defend any claim arising out of such reported event as it deems expedient. Such action shall not waive any right the Company may have to deny any obligations under the policy contract, and shall not waive any right of the undersigned.

(*Id.*) Clifford signed below this statement. (*Id.*)

G.    *State Farm's investigation*

State Farm began its investigation the day of the fire. (Clifford Claim File 32-33.) State Farm's Claim Representative, David Lucas ("Lucas") began working on the case on October 9, 2008. (*Id.* at 34.)

1.    Clifford's account of the day of the fire

Clifford talked to State Farm representatives on the day of the fire. (Clifford Claim File 36.) She stated that she had not been staying at her house since it started getting cold, but that she and her two children went to the house every day around four and stayed until it started getting cold. (*Id.*) The last time Clifford slept at the house was

on October 2, 2008; since that time she, her two children, and her dog had been staying at her mother's house. (*Id.* at 34.) The last time she was in the house was October 6, 2008, at around 4:30 p.m. Clifford said that there was no gas to the house, but it was supposed to be delivered that week. (*Id.* at 35.) She had been using electrical heaters to heat the house, but they were not running during times that no one was in the house. (*Id.* at 35-36.) Only Clifford and her mother had keys to the house. (*Id.* at 34.)

At the time of the fire, the children were at school. (*Id.*) Clifford informed State Farm that she left her mother's house around eleven for her job at Pulaski Memorial Hospital and was informed by her boss at work at around 11:30 a.m. that her house was on fire. (*Id.* at 34-35.) She told State Farm that the fireman said it had been an electrical fire. (*Id.* at 34, 36.) Clifford said that the ceiling fan/light in her house would sporadically go off and on. (*Id.* at 34.) She had not hired anyone to come look at the electrical system. (*Id.*) Clifford informed State Farm that the fire caused a total loss of the house and the fire department was not allowing anyone into the building. (*Id.* at 35.)

Clifford gave a recorded statement to Lucas on October 14, 2008. (*Id.* at 32.) Clifford informed Lucas that her mother owned and drove a maroon van. (*Id.* at 860, 886.) She stated that the doors and windows to the house were locked on the day of the fire. (*Id.* at 870, 872.) She stated that the locks to the house had been changed about two months before the fire and only she and her mother had keys to the house. (*Id.* at 873.) Clifford stated that she did not have any lighter fluid, oil based paints, paint thinners, kerosene, lamp oil, lantern fuel, or gasoline in the house. (*Id.* at 878.)

Clifford stated that on the day of the fire she woke up at 6:00 a.m., took her children to school at around 7:45 a.m., and returned to her mother's house at around 8:10 a.m. (Clifford Claim File 867.) After breakfast, Clifford went to pick up her friend Randy Hovis ("Hovis") who was like a brother to her. (*Id.* at 868.) He lived about a half mile to a mile away from her mother's house, and she drove her mother's maroon van to pick him up sometime around 9:30 or 10:00 a.m. so that he could mow the lawn of her mother's home. (*Id.* at 868, 886.) She returned to her mother's house with Hovis at around 10:00 a.m. or a quarter after. (*Id.* at 869.) Clifford stated that she left for work at about 10:50 a.m. and punched in at work between 11:10 and 11:15 a.m. (*Id.*) She stated that it takes her about five to six minutes to get to work. (*Id.*) That day, she arrived at the parking lot of her work at about 10:55 or 10:56 a.m., parked her car, and lit a cigarette. (*Id.*) She sat in her car for fifteen to twenty minutes to smoke a few cigarettes before going into work. (*Id.*) After Clifford checked into work and was notified of the fire, her boss drove her to her mother's house. (*Id.* at 886.) From there, Clifford, her mother, and Hovis went to the scene of the fire. (*Id.* at 887.)

Clifford stated that she had not talked to Hovis or her mother about burning her house. (Clifford Claim File 887.) She also stated that there would be no reason that Hovis would just go burn her house. (*Id.*) She stated that she never said that she wanted the house to burn down and that she loved her house. (*Id.*) She said that there would have been no reason that Hovis, her mother, or anyone else would think that they were

doing her a favor by burning the house. (*Id.*) She also said that there was no reason that anyone would have seen the maroon van over by her house before the fire. (*Id.*)

Clifford provided more information to State Farm during her examination under oath ("EUO") on July 31, 2009. Clifford again stated that she had experienced electrical problems with her ceiling fans, elaborating that "they were hanging down with bare wires," they shook badly when turned on, and she once saw a spark come from one. (Clifford EUO 42-43, Pl.'s Exh. 27, DE # 23-27 at 23.) She did not have an electrician or anyone else look at the fans. (*Id.* at 43.) She also stated that her window air conditioner units at the house would blow fuses when they were turned on. (*Id.*) She continued that in the last few months before the fire there was nothing she was using that had electrical problems. (*Id.*) She also stated that she kept a red plastic container on her front porch so that she could put gasoline into it when she was ready to mow her lawn. (*Id.* at 60.)

## 2. Clifford's mother's account of the day of the fire

Grace Clifford, Clifford's mother, gave a recorded statement to Lucas on October 22, 2008. (Pl.'s Exh. 11, DE # 23-11 at 1.) She stated that on the day of the fire, she and Clifford took Clifford's children to school and then picked up Hovis at about 10:30 or 11:00 a.m. (*Id.*) She stated that Clifford left for work at about 11:15 a.m. (*Id.*) She stated that Clifford came back to Grace's house and was crying. (*Id.*) Grace Clifford stated that she "broke down" when she saw Clifford's house on fire because all of Grace's husband's things were in that house. (*Id.*) She stated that Pulaski County

Deputy Sheriff Paul Grandstaff ("Grandstaff") told her that he thought that the fire was electrical. (*Id.*)

### 3.     Distances between relevant places

Lucas determined how long it took to drive between the locations involved in this case. (Clifford Claim File 31.) Lucas found that it took four minutes to drive from Clifford's mother's home to Clifford's work. (*Id.*) He also found that it took about eleven minutes to drive from Clifford's house to her mother's house and seven minutes to drive from Clifford's house to her work. (*Id.*)

### 4.     Clifford's financial situation

State Farm learned from Clifford's insurance agent that, prior to the fire, Clifford had been injured, requiring her to take time off of work, and that people in her community were taking a collection to help pay her gas bill. (Clifford Claim File 34.) During her initial recorded statement with State Farm on October 14, 2008, Clifford provided information about her financial situation. (*Id.* at 32, 858.) Clifford worked 35 hours a week for $8 an hour. (Clifford Claim File 133, Pl.'s Exh. 9, DE # 23-10.) One of her sons received $545 a month in social security payments. (Clifford Claim File 858.) Her other son received child support payments of $84 every two weeks "when his dad decide[d] to pay it." (*Id.; see also* Clifford EUO 23 (stating that Clifford was supposed to receive child support payments but only did when her child's father felt like sending it).) When asked if she had any money saved anywhere, Clifford said she had $5 in the bank. (Clifford Claim File 858.) Clifford's gas had been shut off because she owed $1,300

on her account. (Clifford EUO 44, 46.) Clifford's church helped her get the money to pay the bill and she sent the money to the gas company the Friday before the fire. (*Id.* at 44; Clifford Claim File 34.) She also stated that her monthly expenses were a mortgage payment of $627, a gas bill of $140, an electric bill of $94, a satelite bill of $120, and a cell phone bill of $100. (*Id.* at 858-60.) She stated that her payments were current on these bills. (*Id.* at 859.) Clifford told Lucas that she did not have any credit cards or outstanding loans and that she did not owe anything on her car. (*Id.* at 860.) Thus, her monthly expenses were $1,081.

Clifford had filed for bankruptcy which had been discharged in June, 2002. (*Id.* at 31, 861.) Her credit report showed that she had medical collection items totaling to $4,789, a $3,309 unpaid collection item, and a $554 collection account. (*Id.* at 31.) She stated that she had never tried to sell the house. (*Id.* at 861.)

### 5. Shandforensic's investigation

State Farm hired Shandforensic Investigations ("Shand") to complete a cause and origin report of the fire in Clifford's house. (Clifford Claim File 246.) Shand's report found that the burn patterns and degree of damage to the house showed that the fire originated in several different areas. (*Id.* at 248.) It found that the "reports of movement down the stairs prior to any fire on the first floor, coupled with the rapid involvement of the first floor rooms, indicates the use of an ignitable liquid to accelerate fire." (*Id.*) It also stated that an accelerant detection canine was run through the first-floor rooms and alerted near a hole that burned through the floor in the bedroom. (*Id.*) Burn patterns in

the kitchen tile also indicated use of a liquid accelerant. (*Id.*) Further, oxidation patterns on the remains of several appliances revealed upward burning from the floor level which would not be consistent with fire movement from the living room door into the kitchen. (*Id.*) Burn patterns on the sofa and in the first floor bedroom also indicated use of a liquid accelerant. (*Id.* at 249.) Shand conducted a laboratory analysis of debris from the fire and "failed to identify the ignitable liquid used." (*Id.* at 246.)

Shand's report concluded that the fire started in multiple rooms of the house, the fire was observed to have started on the first floor and the fire damage on the first level was not consistent with a natural fire moving from the second to first floor, the fire movement down the stairs and rapid involvement of the first floor rooms indicated the use of an accelerant, and potential accidental ignition sources on the first floor were examined and eliminated as causes of the fire. (*Id.*) Thus, Shand's report determined that the fire was incendiary. (*Id.*)

### 6.     State Farm's recorded statement of Shank

Lucas took a recorded statement from Shank on October 15, 2008. (Clifford Claim File 30.) Shank stated that he found the house secure, did not see any smoke or fire on the first floor at first, and observed that flames on the stairs were running from upstairs to downstairs. (*Id.*) He stated that it took the Monterey and Winamac Fire Departments ten to fifteen minutes to respond to his 911 call. (*Id.*) During that period, the fire went from just the upstairs to consuming the whole house. (*Id.*) He told Lucas that he thought

there was an accelerant present to assist the spread of the fire since fire does not usually run down stairs. (*Id.*)

### 7. Lucas's conversation with Pulaski County Deputy Sheriff Paul Grandstaff

On October 21, 2008, Lucas spoke with Deputy Sheriff Paul Grandstaff ("Grandstaff"). (Clifford Claim File 28.) Grandstaff told Lucas that a witness, Romel Scholz ("Scholz"), had stated that she saw a maroon van driving near Clifford's house just before the fire and saw a thin man with a ball cap, bushy hair, gray in the back, and blue jeans walking near the house just before the fire. (*Id.*) Grandstaff said that he thought this description matched Hovis. (*Id.*) He said that he knew the Clifford family from church and that a few weeks before October 21, 2008, Clifford's mother had asked him about whether they could get Clifford's house financed or refinanced. (*Id.*)

### 8. State Farm's recorded statements of Scholz

On October 22, 2008, Lucas took a recorded statement of Scholz, the witness who called 911 after seeing a man walking away from Clifford's house. (Clifford Claim File 200.) Scholz was driving near the area of the fire on County Road 200 and saw a six foot tall, thin man wearing a light blue jacket, light blue jeans, and either a hood or a baseball cap. (*Id.*) The man's hair was "all bushed out" around his head. (*Id.*) Scholz and Lucas had the following conversation about the man's hair color:

> Q. What, what color was his hair?
> A. And it was . . . I would say like a, a sandy brown. Did look like a two tone or coulda maybe been some blonde in it or grays. . . . I don't know.
> Q. Just some kind of a . . .

A.      It wasn't . . . no.
Q.      Is it a sandy blonde or gray hair?
A.      Yeah. It was black.
Q.      Okay.

(*Id*.)

Scholz stated that the man was walking north near the intersection of County

Road 200 and 400 East, near Clifford's house. (*Id*.) She said that the man was heading

north on Laughton Road and then a maroon van, which was coming from the north and

heading south stopped, picked the man up, and then continued heading south.

(*Id*. at 201.) Scholz said that the man entered the car through the side door because there

were already two adult women sitting in the front seats. (*Id*.) She stated that she saw the

van pick up the man at about 10:45 a.m. on October 7, 2008. (*Id*. at 204.) Scholz saw the

man being picked up by looking through the mirror on her car.[2] (*Id*. at 201.)

On November 19, 2008, Lucas showed Scholz pictures of Hovis and Clifford's

mother's van. (Clifford Claim File 24.) Lucas wrote in Clifford's claim file:

> Met with Romel Scholz and showed her the photographs of Grace
> Clifford's Maroon Van & of Randy Hovis. Romel Scholz stated the
> Maroon van looks like the van she saw on the day of the fire, and the hair
> & body type looks like the man she saw from the back on the day of the
> fire.

---

[2] Clifford also cites to Scholz's deposition for this type of testimony. (Pl.'s
Mem. 7.) Scholz's deposition was taken on June 1, 2010, after this lawsuit was
commenced and after Clifford's claim was denied. (Pl.'s Exh. 30, DE # 23-30.) For the
bad faith claim, the court's focus is on what information State Farm had when
processing Clifford's claim. *See e.g., Thompson Hardwoods, Inc. v. Transp. Ins. Co.*,
No. 00-74-C, 2002 U.S. Dist. Lexis 4592, at*6 n.1 (S.D. Ind. Mar. 15, 2002). Thus
information that was not available until after the alleged delay took place and the claim
was denied is immaterial.

(*Id.*) In her second recorded statement to Lucas, Scholz saw the picture of Hovis and stated that the man she saw the day of the fire had the same build as Hovis: "Yes. Same build, but I could not recog. . . I could not ident. . . I didn't see the face." (Pl.'s Exh. 9, DE # 23-9 at 1.) She also commented on the picture of Hovis: "The hair looks a lot like the same character I seen walkin'." (*Id.*) Upon seeing a picture of Grace Clifford's maroon van, Scholz stated: "That looks uh, like the van I seen pick him up." (*Id.* at 2.)

### 9.    Investigation into Scholz's statement

Lucas took Hovis' recorded statement on October 22, 2008. (Clifford Claim File 28.) He stated that he was not at or near Clifford's house on the morning of the fire. (*Id.*) Lucas also took a recorded statement from Grace Clifford, Clifford's mother, at that time. (*Id.*) Clifford's mother stated that she and her maroon van were not at or near Clifford's house at the time of the fire. (*Id.*)

On November 5, 2008, Lucas took pictures of Hovis. (*Id.* at 26.) Clifford was present at that time and Lucas told her that he could not clear her as a possible suspect in the fire. (*Id.*) As Lucas was leaving, Hovis walked over to him and told him that he had recorded Lucas's conversations that day and would give a copy to the FBI. (*Id.*) He also stated that he had a lawsuit against the State of Indiana. (*Id.*)

On February 18, 2009, Lucas noted that he had information that Hovis believed that nurses who cared for his father could testify that he was at his father's home when the fire started. (Clifford Claim File 18, DE # 12-1.) Lucas's supervisor, Mike Thomas, asked Lucas to follow up about the nurses. (*Id.*) On May 5, 2009, Lucas reported that

State Farm's Attorney, Robert S. O'Dell ("O'Dell") contacted the hospital that the nurses worked for and was told by the hospital director that she would not provide the names or time records of the nurses. (*Id.* at 10.) O'Dell and Clifford's attorney planned to work together to get that information. (*Id.*)

10.    State Farm's communications with Clifford to obtain documents

On November 17, 2008, State Farm was informed that attorney Dale Starkes ("Starkes") was representing Clifford. (Clifford Claim File 24.) After this point, most of State Farm's communications with Clifford was done through Starkes. (Clifford Dep. 140.) Clifford relied on Starkes to handle her claim with State Farm and to get it the information that was needed. (*Id.* at 148.) In late November, 2008, State Farm sent Clifford a letter outlining her duties under the policy and informing her that its attorney would contact her attorney to set a time for her to submit to an EUO. (*Id.* at 140; Clifford Claim File 22; Pl.'s Exh. 14, DE # 23-14.) The letter informed Clifford that State Farm had received her Personal Property Inventory Forms but it could not pay her based on that submission as it was continuing its investigation of her claim. (*Id.*) In December 2008, State Farm wrote to Starkes to get information about Clifford's mortgage payment history. (Clifford Dep. 147.) Starkes submitted the mortgage payment documents to State Farm by February 18, 2009. (Clifford Claim File 218.)

EUOs for Clifford and her mother were scheduled for May 12, 2009. (Clifford Claim File 10.) Prior to the EUOs, State Farm sent Clifford a letter reiterating the date of the EUOs and asking her to bring various documents to her EUO. (Pl.'s Exh. 15,

DE # 23-15.) The documents related to her financial condition and the value of her claim and included receipts and paid bills for personal property, her tax returns for the three years prior to the fire, a list of all creditors and authorization to obtain records from those creditors, loan agreements with creditors, check-stubs and W-2 forms to show income, cell phone records for September and October 2008, and any documents relating to any bankruptcy filings. (*Id*.) Starkes sent State Farm pictures of Clifford's house. (Pl.'s Exh. 17, DE # 23-17.)

On May 11, 2009, State Farm was informed that Clifford had fired Starkes and hired a public adjustor, Jay Hatfield ("Hatfield") of Midwest Public Adjusting. (Clifford Claim File 9.) Clifford stated that she terminated Starkes because she was not "real comfortable with him" and she had a communication problem with him. (Clifford Dep. 150.) Clifford asked for an extension of time for the EUOs in order to obtain new counsel. (Clifford Claim File 9.) State Farm granted this request and the EUOs were rescheduled for July 8, 2009. (*Id*. at 8.) On May 26, 2009, State Farm's attorney received notice that Clifford's new attorney was Steven L. Davies ("Davies") and a certified copy of the policy was sent to him. (*Id.* at 7-8.) Davies quit the firm and, on July 8, 2009, his former partner, Kevin Marshall, who had taken over the representation of Clifford, appeared at the scheduled EUO and demanded a copy of the declarations page that listed Grace Clifford, Clifford's mother, as an insured for the date of loss before he would let her submit to an EUO. (*Id.* at 7.)

As a result, the EUOs were reset for July 31, 2009 and took place on that day. (*Id.* at 6, 700.) At the end of Clifford's EUO, State Farm's attorney asked Clifford about documents that were supposed to be produced by that time that had not been produced. (*Id.* at 725.) Clifford responded that Hatfield had most of those documents including her income tax returns from the last three years, her list of creditors, loan agreements with creditors, her cell phone records for September and October 2008, and invoices and bills. (*Id.*) When asked if she had any collection or foreclosure notices, Clifford stated that she thought she had them. (*Id.*) When asked if she had W-2s or other things that showed her income, Clifford responded that she was not sure if she had given them to State Farm and if she had not she would have them "at the house." (*Id.*) In her deposition, Clifford stated that she did not bring the requested documents with her to the EUO. (Clifford Dep. 179.) In contrast to her testimony at the EUO, she stated that she had not brought them because she had given them to Starkes. (*Id.* at 180.)

Clifford's policy with State Farm stated that the insured needed to submit a sworn proof of loss form within sixty days of the loss. (State Farm Policy 13.) Clifford provided the proof of loss to State Farm on July 1, 2009. (Clifford Dep. 183.)

## 11. Clifford's investigation

State Farm's case activity log shows that Clifford's former attorney, Starkes, called Mike Thomas ("Thomas") at State Farm on March 12, 2009. Starkes told Thomas that he had received information from an expert they had hired, Jack Fetrow of Donan

Engineering, that the fire was not accidental. (Clifford Claim File 17.) Thomas wrote that Starkes said:

> [T]he insureds now think the fire was caused by Mr. Hovis. They feel he burned the home to secure insurance proceeds to build a new home. Reportedly he considers himself insured's boyfriend.

(*Id.*) In her EUO testimony, Clifford stated that Starkes told her that he believed Hovis started the fire because Hovis was crazy. (Clifford Claim File 722.) On April 2, 2009, State Farm's attorney sent Starkes a letter stating that Starkes' expert and State Farm agreed that the fire was intentionally set. (Pl.'s Exh. 16, DE # 23-16.) The letter informed Starkes that State Farm would not perform any additional investigation relating to the structure of the property. (*Id.*)

### 12. Lucas's account of the investigation

At a deposition, Lucas testified that based on its investigation, State Farm did not believe that Clifford "herself was at the house starting the fire." (David Lucas Dep. 26, Pl.'s Exh. 28, DE # 23-28.) He continued: "Our – our investigation pretty quickly point – we had a witness – pointed to the facts and circumstances, and those facts and circumstances didn't include Helen Clifford being in the house starting the fire." (*Id.*) He said, "My investigation showed that [Clifford] was not in the house itself – likely not in the house itself prior to the fire." (*Id.*)

### H. *Clifford's account of State Farm's treatment of her*

In her deposition, given on December 14, 2009, Clifford agreed that she did not have a problem with State Farm investigating whether the fire was intentionally set.

(Clifford Dep. 132.) Clifford was asked if State Farm had said anything to her that was rude, obnoxious, or made her feel bad. (*Id*. at 144.) Clifford responded that David Lucas had once hung up on her. (*Id*.) She stated that before she hired Starkes, she called Lucas to see how her case was going because no one had told her anything. (*Id*.) She asked Lucas if her mother was going to get her rent and he said "Pay it out of your pocket," and hung up on her. (*Id*.) Clifford was asked whether she knew if Lucas actually hung up on her or whether they were disconnected and she responded that she figured he had hung up on her. (*Id*. at 144-45.) She was asked if it was true that Lucas called her back but got her voicemail and she responded that that could have been true. (*Id*. at 145.)

Clifford did not have any evidence of State Farm acting with bad faith or inappropriately during the time that she was represented by Starkes. (Clifford Dep. 153.) She stated that she was not sure if she had any facts that State Farm made an unfounded refusal of her claim. (*Id*. at 200.) She stated that she was not aware of any facts that State Farm tried to trick her in any way after the fire. (*Id*. at 201.) Clifford stated that she could not recall anyone from State Farm saying anything to her out of the ordinary or that made her upset. (*Id*. at 173.)

I.  *Clifford's lawsuit and State Farm's denial of her claim*

Clifford filed a complaint against State Farm in Indiana State Court on August 31, 2009. (DE # 1.) She listed claims of breach of contract, failure to maintain

good faith, bad faith, and agent's negligence and misrepresentation.[3] The complaint focuses on State Farm's alleged delay in investigating and settling Clifford's claim. (DE # 1 ¶¶ 2, 3, 9.) It states that State Farm failed to affirm or deny coverage within a reasonable time after proof of loss statements were submitted and compelled "insured to institute litigation to recover amounts due under an insurance policy by denying coverage based on a misstatement of the policy provision and involvement of the statutorily retained public adjustor pursuant to I.C. 27-1-27-1 et seq." (*Id.* ¶ 7.)

On October 20, 2009, State Farm sent Clifford a letter informing her that her policy would be canceled as of November 22, 2009. (Pl.'s Exh. 19, DE # 23-19.) State Farm sent Clifford a letter denying her claim on November 25, 2009. (Pl.'s Exh. 21, DE # 23-21 at 1.) The letter informed Clifford that her claim was being denied because 1) it did not involve an "accidental direct physical loss;" 2) the policy was rendered void because the insured caused or procured the loss; 3) the policy was rendered void because of Clifford's intentional concealment and misrepresentation of facts material to the claim; and 4) Clifford breached the policy by failing to comply with the policy by not providing State Farm with documents it requested and not signing and returning the transcript from her EUO. (*Id.*)

---

[3] The Indiana State Court granted summary judgment to the agent on this claim. (DE # 2-10.)

*J.*     *The parties' arguments*

As stated above, State Farm has moved for summary judgment on Clifford's

claims for bad faith, failure to maintain good faith,[4] punitive damages, and attorney fees

First, State Farm argues that when the conduct giving rise to a claim of bad faith is not a

claim denial, evidence of conduct after the filing of the bad faith claim is irrelevant.

(DE # 11 at 14.) It points out that when Clifford filed her lawsuit, State Farm had not

denied her claim and was seeking additional information needed to evaluate her claim.

(*Id.* at 16.) It argues that any delay in evaluating the claim was due to Clifford's failure

to provide that information. (*Id.* at 17.) Thus, it argues that Clifford's claims for breach

of the duty of good faith and fair dealing should be dismissed.

State Farm also argues that Clifford's claims of the breach of the duty of good

faith and fair dealing should be dismissed because the evidence that State Farm

gathered in evaluating the claim supported a conclusion that Clifford had caused the

fire to be set, providing a rational and principled basis for State Farm's denial of her

claim. (*Id.* at 18-19.) It states that Clifford's own lawyer advised State Farm that Hovis

set the fire. (*Id.* at 18.) Further, State Farm argues that Clifford does not have clear and

convincing evidence to show that it acted with malice, fraud, gross negligence, or

oppressiveness as required to support an award of punitive damages. (DE # 11 at 20.) It

also argues that Clifford cannot recover attorney fees because the policy did not provide

---

[4] Clifford listed these as two separate claims, but they appear to be one claim
under Indiana law and the court will treat them as one claim. The court will also
consider allegations for bad faith under Clifford's request for punitive damages.

for attorney fees and Indiana follows the American Rule that parties pay their own attorney fees. (*Id.* at 20.)

In opposition to summary judgment, Clifford argues that she made diligent efforts to comply with State Farm's requests for information, but she could not produce many of the documents because they had been destroyed in the fire. (Pl.'s Mem. 16.) She also argues that State Farm requested documents beyond those needed to prove loss. (*Id.* at 17.) She argues that State Farm's request for "voluminous" financial records was not authorized under the contract. (*Id.*) Clifford argues that a material issue of fact exists as to whether State Farm acted with bad faith because the evidence shows that State Farm made an unfounded refusal to pay on the policy, caused an undue delay in making payment, pressured her to forego her fire loss claim, or pressured her to settle for less than the full value under the policy. (*Id.* at 19.) She contends State Farm acted with bad faith and caused her harm by effectuating criminal charges against her. (*Id.*)

Clifford argues that it was unreasonable of State Farm to look into her financial motive for committing arson because its investigation showed that she was at work and did not set the fire. (*Id.* at 20.) She argues that State Farm acted with fraud and gross negligence when it delayed her claim by thirteen months by requesting documents that related to an inquiry of whether her claim was barred on the basis that she procured arson of her house. (*Id.* at 21.) She argues that State Farm's theory that she procured arson of her house amounted to an intentional strategy to not pay her on her policy. (*Id.* at 21.) She accuses State Farm of grounding its entire claim denial process upon the

credit worthiness of the insured, a practice that she insinuates is immoral and amounts to discrimination based on financial means. (*Id.* at 22.)

Clifford's current attorney denies that he ever stated that he believed that Hovis started the fire.[5] (Pl.'s Mem. 23.) Clifford also takes issue with State Farm's assertions that she had a financial incentive to procure arson of her house and that she paid her insurance premiums before the fire was set so that her policy would be effective. (*Id.* at 23-24.) She argues that once State Farm determined that she was not in the house and did not start the fire, it should have closed its investigation and determined how much to pay her. (*Id.* at 24.)

Clifford asserts that she is entitled to punitive damages for State Farm's bad faith and then launches into a discussion of how the preponderance of evidence standard applies for determining whether an insurance company acted with bad faith and the clear and convincing evidence standard applies to awarding punitive damages. (*See id.* at 26-29.) She argues that the award of attorney fees is appropriate when a party litigated the action in bad faith. (*Id.* at 29.) She argues that an insurance company's denial of coverage in a bad faith dispute can lead to a conclusion that the insurer litigated the action in bad faith. (*Id.* at 29-30.)

In reply, State Farm points to evidence from both the Fire Marshal and its own investigation that shows that the fire was intentionally set. (Def.'s Reply, DE # 24 at 2.)

---

[5] However, the record and State Farm's brief indicate only that Clifford's former attorney, Starkes, stated that he believed Hovis started the fire.

It also argues that it may rely on evidence of Clifford's financial condition to demonstrate a financial motive to procure arson. (*Id.* at 3.) As State Farm points out, Clifford has not cited to any evidence to show that it was impossible for her to produce the requested records. (*Id.* at 5.) In fact, Clifford testified in her deposition that she had not brought the records because she had given them to her prior counsel. (*Id.* at 6.)

State Farm contends that Clifford's response does not acknowledge the full extent of her financial obligations before the fire as shown in the evidence. (*Id.* at 3.) State Farm also argues that it was permitted to rely on Scholz's testimony when handling Clifford's claim and that an arson defense for denying an insurance claim can be based on the insured's procurement of arson. (*Id.* at 4-5.) It argues that there is sufficient evidence showing that State Farm had a rational, principled basis for its belief that Clifford procured arson of her house. (*Id.* at 8-9.) It contends that the fact that no one has been arrested or prosecuted in relation to the arson is irrelevant. (*Id.* at 10.)

## II.     STANDARD OF REVIEW

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying" those materials listed in RULE 56(c) which "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the nonmovant may not rest upon mere allegations. Instead, "[t]o successfully oppose a motion for summary judgment, the nonmoving party must come forward with specific facts demonstrating that there is a genuine issue for trial." *Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 677 (7th Cir. 2008). "It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies." *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). When evaluating a motion for summary judgment, the court views the record and makes all reasonable inferences in a light most favorable to the nonmovant. *Popovits*, 185 F.3d at 731. If the non-moving party cannot establish an essential element of its claim, RULE 56(a) requires entry of summary judgment on that claim. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006) (citing *Celotex*, 477 U.S. at 322-23).

## III.  ANALYSIS

### A.  Bad faith

In Indiana, "there is a legal duty implied in all insurance contracts that the insurer deal in good faith with its insured." *Erie Ins. Co. v. Hickman*, 622 N.E.2d 515, 518 (Ind. 1993). A claim of bad faith, also called a breach of the duty of good faith, exists when the insurer breaches this duty by denying a claim when it knows that there is no rational, principled basis for doing so. *Freidline v. Shelby Ins. Co.*, 774 N.E.2d 37, 40 (Ind.

2002). Proof of bad faith exists when there is "clear and convincing evidence[6] which establishes the insurer had knowledge that there was no legitimate basis for denying liability." *Id.* (citing *Ind. Ins. Co. v. Plummer Power Mower & Tool Rental, Inc.*, 590 N.E.2d 1085, 1093 (Ind. Ct. App. 1992)). A finding of bad faith requires evidence of a state of mind of "conscious wrongdoing" including "dishonest purpose, moral obliquity, furtive design, or ill will." *See Monroe Guar. Ins. Co. v. Magwerks Corp.*, 829 N.E.2d 968, 977 (Ind. 2005) (internal quotation omitted); *Colley v. Ind. Farmers Mut. Ins. Group,* 691 N.E.2d 1259, 1261 (Ind. Ct. App. 1998) ("Poor judgment or negligence do not amount to bad faith; the additional element of conscious wrongdoing must also be present.").

A claim for bad faith is not generated by every erroneous denial of an insurance claim. *Hickman*, 622 N.E.2d at 520. Insurers may dispute claims in good faith, erroneously deny a claim, fail to diligently investigate a claim, or even breach a contract without committing an act of bad faith. *Id.*; *Allstate Ins. Co. v. Hennings*, 827 N.E.2d 1244, 1250 (Ind. Ct. App. 2005). Bad faith does not exist when an insurer rests its coverage decision upon a rational basis. *Masonic Temple Ass'n of Crawfordsville v. Ind. Farmers Mut. Ins. Co.*, 779 N.E.2d 21, 29-30 (Ind. Ct. Ap. 2002); *Patel v. United Fire & Cas. Co.*,

---

[6] The *Freidline* decision states that the standard for proving a bad faith claim is "clear and convincing evidence." *See also Sexson v. State Farm Fire & Cas. Co.*, 61 F. App'x 267, 271 (7th Cir. 2003). There is some possibility that the standard for proving a bad faith claim is preponderance of the evidence and the standard for proving punitive damages is clear and convincing evidence. *See Hickman*, 622 N.E.2d at 520; *Donald v. Liberty Mut. Ins. Co.*, 18 F.3d 474, 484 (7th Cir. 1994). However, Clifford cannot prove her bad faith claim under either standard.

80 F. Supp. 2d 948, 958 (N.D. Ind. 2000); *Colley*, 691 N.E.2d at 1261 (insurer not liable for bad faith if it denies liability with a rational, principled basis for doing so).

In sum, as one court has explained, "a successful bad faith claim is composed of an objective element (such as the lack of a reasonable basis to deny a claim) and a subjective element (such as the knowledge of the lack of a reasonable basis to deny a claim)." *Balzer v. Am. Family Ins. Co.*, No. 2:08-cv-241, 2011 U.S. Dist. LEXIS 32701, at *14-16 (N.D. Ind. Mar. 28, 2011). To succeed on a bad faith claim at trial, a plaintiff must produce evidence establishing that there was no reasonable basis to deny the claim and that the insurer knew that there was no reasonable basis. *Id.* Although the scope of the duty of good faith is not precisely defined, the Indiana Supreme Court has identified a non-exhaustive list of actions that can constitute bad faith. *See id.* at 976. These are: "(l) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in making payment; (3) deceiving the insured; and (4) exercising any unfair advantage to pressure an insured into a settlement of his claim."[7] *Hickman,* 622 N.E.2d at 519; *Monroe Guar. Ins. Co. v. Magwerks Corp.*, 829 N.E.2d 968 (Ind. 2005).

---

[7] Clifford also argues that State Farm has violated Indiana's Unfair Claims Settlement statute, INDIANA CODE § 27-4-1-4.5. However, as State Farm points out, this statute does not provide a private cause of action. *See* IND. CODE § 27-4-1-18; *Hickman*, 622 N.E.2d at 519 n.1; *Whiles v. Allstate Ins. Co.*, No. 3:04-cv-134, 2005 U.S. Lexis Dist. 32523, at *11 (N.D. Ind. Sept. 9, 2005). In so far as Clifford is arguing that actions that violate the Unfair Claims Settlement Act are bad faith actions, the court is mindful that bad faith can exist through actions beyond those identified in *Hickman* and has carefully evaluated the evidence for proof of such actions.

Clifford argues that State Farm has engaged in all four actions identified as constituting bad faith by *Hickman*. Clifford has not pointed to any evidence that State Farm deceived her. Clifford mentions that State Farm exercised an unfair advantage over her by making "criminal allegations" of arson against her. (Pl.'s Mem. at 19.) However, Clifford has not presented any evidence to support this assertion. (*See id.* at 12, 19.) The record shows only that State Farm stated to Clifford in person and by letter that it was investigating her involvement in the fire and that it concluded that she was involved in procuring the fire. Evidence that an insurer told an insured's acquaintances that he committed arson does not show that it used unfair pressure against him. *See Sexson,* 61 F. App'x at 270-71. Accordingly, State Farm did not exercise an unfair advantage over Clifford when it told her that it was investigating her involvement in the arson of her house. Therefore, the court will focus on whether State Farm caused an undue delay in making payment or made an unfounded refusal to pay on the policy.[8]

To begin, there is not evidence from which a jury could conclude that State Farm caused an unfounded delay in making payment on the policy. First, State Farm was reasonable in investigating whether it had a defense to payment based on a possibility that Clifford procured arson of her house. *See Lottie v. W. Am. Ins. Co.,* 248 F. App'x 734,

---

[8] State Farm argues that Clifford's lawsuit is not based on denial of her claim since it was filed before her claim was denied. While this argument has merit, Clifford's complaint mentions refusal to pay for her loss and her summary judgment argument focuses on denial of her claim. (*See* Pl.'s Mem. at 21.) Therefore, in the interest of completeness, the court will address whether Clifford has evidence to show State Farm's bad faith based on its denial of her claim.

740 (7th Cir. 2007) (unpublished). Second, Clifford argues that State Farm was unreasonable in continuing to investigate the possibility once it established that she could not afford to pay an arsonist and after it did not find a canceled check showing a payment for arson. (Pl.'s Mem. at 20.) While these are creative arguments, they do not show that State Farm's decision to investigate the fire further was irrational.

Further, Clifford repeatedly argues that State Farm had no basis for continuing its investigation of her involvement in the fire, and for eventually denying her claim, once State Farm's investigation revealed that "Helen Clifford was not in the house and did not start the fire." (*Id.* at 24; Lucas Dep. 26, 29.) Lucas's statements, such as the one just quoted, show only that State Farm had concluded that Clifford herself did not light the fire - they do not show that State Farm had ruled out her involvement in bringing about the fire. The policy stated that it would be rendered void "[i]f you or any other person insured under this policy causes or *procures* a loss to property covered under this policy for the purpose of obtaining insurance benefits." (State Farm Policy 7 (emphasis added).) Further, under Indiana law an arson defense can be predicated on evidence showing that the insured procured arson of his or her property. *See Gregory's Cont'l Coiffures & Boutiques v. St. Paul & Marine Ins. Co.*, 536 F.2d 1187, 1191 (7th Cir. 1976). Thus, contrary to Clifford's argument, State Farm was not unreasonable in continuing to investigate and in denying Clifford's claim after it determined that she was not in the house when the fire started.

Third, Clifford's argument that State Farm's requests for documents about her financial condition were unauthorized is unavailing. Clifford argues that it was immoral, unfair, and illegal for State Farm to consider her credit history and financial condition when processing her claim. (Pl.'s Mem. 22, 16.) However, Clifford agreed to provide State Farm with information needed to process her claim. Her policy with State Farm required her to provide documents and information to State Farm as needed to process her claim. Clifford also signed a "Request for Claim Service and Non-waiver of Rights" form that stated that she "request(s) and authorize(s) the Company to investigate, negotiate, settle, deny or defend" any claim arising from her loss. (Clifford Claim File 816.) Therefore, Clifford agreed to cooperate with the investigation and State Farm was entitled to rely upon her cooperation. *Cf. Wood v. Allstate Ins. Co.*, 21 F.3d 741, 745 (7th Cir. 1994) (stating that cooperation clauses are clearly valid because they "'enable the company to possess itself of all knowledge, and all information as to other sources and means of knowledge, in regard to facts, material to their rights, to enable them to decide upon their obligations, and to protect them against false claims'") (citing *Claflin v. Commonwealth Ins. Co. of Boston, Mass.*, 110 U.S. 81, 94-95 (1884)).

Further, as part of its investigation into the arson defense, State Farm could reasonably look into whether Clifford would have a financial motive for procuring arson. This is because, as explained below, an arson defense can be based on circumstantial evidence including motive. *Cincinnati Ins. Co. v. Compton*, 569 N.E.2d 728, 730 (Ind. Ct. App. 1991). Clifford's credit report revealed that she had

unpaid collection items of at least $8,852 against her. This information was relevant to State Farm's investigation of Clifford's claim. In *Wood*, the Seventh Circuit discussed that it is understandable that an insurer would request access to an insured's income tax returns. 21 F.3d at 747. The court explained: "Where the possibility is raised that an insured torched her own house in order to collect on the insurance policy, the financial condition of the insured is plausibly at issue." *Id.* Accordingly, it was reasonable for State Farm to request information related to Clifford's financial situation. *Cf. United States v. Fakhoury*, 819 F.2d 1415, 1421 (7th Cir. 1987).

Fourth, as State Farm argues, Clifford caused much of the delay in State Farm's handling of her claim by submitting her proof of loss well after the sixty days required by the policy, by failing to submit the requested documents, and by rescheduling the EUO of herself and her mother. To start, it is reasonable for an insurer to require an insured to submit to an EUO and to provide documents related to her loss. *See Morris v. Econ. Fire & Cas.*, 848 N.E.2d 663, 667 (Ind. 2006). Clifford does not argue that the manner or frequency of State Farm's request was unreasonable. Instead she argues that State Farm requested documents that were impossible for her to retrieve because they were destroyed in the fire. (Pl.'s Mem. at 16.) However, Clifford has not produced any evidence showing that the documents State Farm requested were destroyed in the fire, or, more importantly, that State Farm was informed that the documents were unavailable because they were burned in the fire. In fact, Clifford told State Farm's attorney at her EUO that she had given some of the requested documents, such as her

tax returns and cell phone records, to Hatfield,[9] that she thought that she had given State Farm other documents, and that she did have one type of document but it was "at the house." She did not state that any of the documents had been in the fire or were not available. Given these statements from Clifford, it was reasonable for State Farm to expect that the documents were available and to try to procure them.

Further, once State Farm made its reasonable requests of Clifford, she did not promptly respond. Clifford did not provide the proof of loss to State Farm until July 1, 2009, nine months after the loss, when her policy required her to submit it two months after the loss. (Clifford Dep. 183.) Her EUO was originally scheduled for May 12, 2009, and Clifford asked twice for the date to be extended. She did not submit to an EUO until July 31, 2009, and there are several requested documents that she never submitted to State Farm. Clifford brought her lawsuit against State Farm for its delay on August 31, 2009, a month after her EUO was completed and only two months after she submitted her proof of loss. A month delay in processing a claim after information has been provided is not so unreasonable as to constitute bad faith. *See e.g., Westers v. Auto-Owners Ins. Co.*, 711 F. Supp. 947, 949-50 (S.D. Ind. 1989) (stating that an insurer acted "promptly" when it denied a claim a little over a month after the insured's proof of loss was submitted). Further, as stated above, State Farm never received several of

---

[9] In her deposition, Clifford asserted that she had given the documents to Starkes. (Clifford Dep. 180.) However, this proposed testimony is irrelevant to Clifford's bad faith claim because Clifford did not give her deposition until December 14, 2009, so State Farm did not have access to it until after it denied her claim.

the documents that it requested from Clifford to process her claim. (Clifford Dep. 200.)

Therefore, Clifford does not have evidence to show that State Farm caused an

unfounded delay in processing her claim.

Next, Clifford does not have evidence to show that State Farm had no rational,

principled basis for denying her claim. Both under the policy and Indiana law, State

Farm was not required to cover any loss that was caused by the insured, Clifford,

causing or procuring the loss. (State Farm Policy 7, 15.) *Lottie*, 248 F. App'x at 740. To

deny a claim on the basis of arson, an insurer needs to be able establish its claim of

willful burning by a preponderance of the evidence and circumstantial evidence is

sufficient to prove arson. *Id.* (citing *Dean v. Ins. Co. of N. Am.*, 453 N.E.2d 1187, 1194 (Ind.

Ct. App. 1983) and *Hoosier Ins. Co., Inc. v. Mangino*, 419 N.E.2d 978, 986 (Ind. Ct. App.

1981)); *Sexson*, 61 F. App'x at 271; *Palace Entm't, Inc. v. Bituminous Cas. Corp.*,

793 F.2d 842, 846 (7th Cir. 1986); *Property Owners Ins. Co. v. Hack*, 559 N.E.2d 396, 399 n.2

(Ind. Ct. App. 1990). This circumstantial evidence can include evidence showing

motive, opportunity, and an incendiary cause of the fire. *Cincinnati Ins. Co.*,

569 N.E.2d at 730; *Dean*, 483 N.E.2d at 1194; *Sexson*, 61 Fed. App'x at 271. It is important

to emphasize that for a bad faith claim, the insurer does not have to have been correct in

its conclusion that it could prove willful burning, it just has to be able to show that it

had a rational, principled basis for concluding that it could prove willful burning.

*Johnny Miller Transp. & Tours, Inc. v. Great Am. Ins. Co. of N.Y.*, No. 4:03-cv-0124,

2005 U.S. Dist. LEXIS 5840, at *24 (S.D. Ind. Mar. 18, 2005).

Three opinions from the United States Court of Appeals for the Seventh Circuit show the type of evidence that can provide a rational basis for an insurer to determine that an insured's loss was due to willful burning. In *Lummis v. State Farm Fire & Cas. Co.*, the plaintiff, Lummis, brought claims of bad faith and breach of contract against his insurance company for denying his claim for the total loss of his home on the basis that it found that Lummis was "intentionally complicit in setting the fire that led to the loss." 469 F.3d 1098, 1099 (7th Cir. 2006). The district court granted summary judgment on the bad faith claim and a jury subsequently found that State Farm breached the contract by not covering the loss and granted damages to Lummis. *Id.*

Lummis had $1,300 a month garnished from his paycheck, he supported his girlfriend and her three children, he had not paid his mortgage for two years, and he received a decree of foreclosure from the mortgage a day before the fire. *Id.* The Seventh Circuit considered that all investigations concluded that the fire was intentionally set, a container with traces of kerosene and gasoline was found by the scene, the defendant had notified Lummis that he had coverage under the policy even though his mortgage company was paying his premiums and when Lummis reported his loss to State Farm he seemed "nonchalant and cavalier." The Seventh Circuit explained:

> Add to this the fact (1) that Lummis had a potential financial benefit in collecting something under the policy; (2) that he was in a financial pinch; (3) that he and Howe purchased gasoline the morning of the fire; (4) that Howe removed her dog from the house before it burned down; and (5) that the fire occurred one day after the foreclosure proceeding, and State Farm's position, as a matter of law, simply can't be viewed as unreasonable or motivated by ill will.

*Id.* at 1100. The Seventh Circuit affirmed the trial court's grant of summary judgment on the bad faith claim because it found that the evidence showed that "no reasonable jury could find that State Farm denied Lummis's claim knowing there was no rational, principled basis for believing that" Lummis was involved in setting the fire. *Id.*

Similarly, in *Sexson*, the Seventh Circuit determined that the insurer had a genuine good faith dispute about whether the plaintiff, Sexson, intentionally caused the loss of his property by fire and affirmed the district court's grant of summary judgment on the Sexson's bad faith claim even though a jury had found that the insurer breached the contract by not covering the loss. 61 F. App'x at 271. The insurer argued that it had evidence of Sexson's motive and opportunity to set the fire in that Sexson had been trying to sell the property for a year, he was the only person with a key to the property and the last person to leave it and lock it up, he called the electric company to turn on the electricity which lead to the fire, and the fire department determined that the fire was incendiary. *Id.* at 271. The Seventh Circuit found that in light of the information the insurer had, Sexson had not shown by clear and convincing evidence that the insurer had no legitimate basis for denying his claim. *Id.*

In *Lottie*, the Seventh Circuit found that an insurance company had produced sufficient evidence to support an arson defense. 248 F. App'x at 740. There, the plaintiff lived in California and his brother took care of his property in Indiana. *Id.* The Seventh Circuit found that the following evidence supported an arson defense: 1) the insurance adjuster, a special investigator for the insurer, and a fire expert all testified that the fire

was intentionally set; 2) Lottie had "some financial difficulties" including $180,000 of debt and the fact that the two lost properties had needed to pass government inspection before they could be leased again; 3) Lottie's brother was the caretaker for the property and had a key to the property; and 4) Lottie's brother was in the vicinity of both fires when they started. *Id.* All of these cases are instructive as to the question of whether circumstances existed from which State Farm could conclude in good faith both that an arson investigation and denial of the claim were warranted.

In this case, it is undisputed that State Farm was aware of the following circumstantial evidence that Clifford procured the fire: 1) she had a potential financial benefit from recovering under the policy; 2) she was in a difficult financial situation supporting two children with no savings and with bills in collection; 3) all three fire investigations, including one commissioned by Clifford and one completed by the Indiana State Fire Marshal, concluded that the fire was set intentionally; 4) a red container was found in the house; 5) an impartial eye witness saw a man who looked like Clifford's good friend, who was with her right before the fire started, at the scene; 6) the same eye witness saw a van that looked like Clifford's mother's maroon van with two women in it stop and pick up the man; 7) Clifford stated that she was sitting alone in her car in her work parking lot at the time the eye witness saw two women picking up a man that looked like Hovis 8) Clifford's former attorney, Starkes, told State Farm that they thought Hovis started the fire; 9) there was no sign of forced entry and only Clifford and her mother had keys to the house; 10) Clifford and her children had not

been staying at the house for four nights before the fire; 11) Clifford paid her September and October premiums five days before the fire and if she had not done so her policy would have lapsed; and 12) Deputy Grandstaff told State Farm that shortly before the fire Grace Clifford had asked him about financing or refinancing Clifford's house. This evidence provided State Farm with a rational, principled basis to deny her claim. *See Westers,* 711 F. Supp. at 947-49 (finding that there was sufficient circumstantial evidence to support the insurer's suspicion of arson when the insurer's investigator found that the fire was incendiary (even though the Fire Marshal deemed it accidental) and the insured had a poor financial condition as shown by the facts that he lost his job, his utilities were shut off for lack of payment, and he failed to make a home payment).

State Farm's reading of this evidence does not have to be accurate, it just cannot be irrational. *Lummis*, 469 F.3d at 1100. Clifford's financial situation was not as dire as that of the plaintiff in *Lummis*, but it was still strained and could reasonably be seen to have provided her with a motive to procure arson. She had bills in collection, her gas had been shut off and she was only able to restore it with help from her church, and the amount of her set bills, without consideration to food or clothing, was close to her monthly income. Given the impartial witness's testimony placing Hovis and Clifford at the scene of the fire immediately after it started, the findings of the three fire investigations, Starkes' statement to State Farm that he believed Hovis started the fire, and Clifford's financial situation, State Farm had a great deal of information from which it could reasonably conclude that an arson investigation was warranted.

Clifford's challenges to the evidence State Farm relied upon do not show that its decision was irrational. Clifford attempts to cast doubt on Scholz's account by pointing out that in her statement to Lucas, Scholz said that the fire started on a different road than the one on which Clifford's house was located and that she viewed part of the scene through her rearview mirror. (*Pl.'s Mem.* 5.) She also contends that Lucas "led Ms. Scholz through the factual scenario" and that Scholz agreed that the man's hair was black after leading. (*Id.* at 6.) These arguments are insufficient to render reliance on Scholz' statement irrational. She stated that she saw the man and the maroon van close to the scene of the fire and she told State Farm that Hovis looked like the man she saw.

Additionally, Clifford has presented some evidence that she had electrical problems with the fan in her house and that Deputy Grandstaff initially thought that the fire could have been electrical. She also stated at her EUO that the red plastic container was at the house to provide fuel for her riding lawn mower. Assuming that the red plastic container had nothing to do with the fire loss, there was still ample evidence supporting the conclusion of all three investigations that the fire was intentionally set. While Clifford thought the fire might have been electrical, she has not presented any evidence disputing the State Fire Marshal's and Shand's conclusions that all accidental causes of the fire were ruled out and that the fire was intentionally set because the fire went downstairs, there were demarcations indicating a liquid accelerant, and the temperature of the fire indicated a liquid accelerant. In sum, Clifford does not have evidence from which a reasonable jury could conclude that States Farm

lacked a rational, principled basis for delaying her claim and for denying payment so her bad faith claim cannot survive summary judgment. *Lummis*, 469 F.3d at 1100.

Furthermore, there is no evidence that State Farm committed bad faith through some action other than the four identified in *Hickman*. To show bad faith, Clifford has to show "the additional element of conscious wrongdoing" or a "culpable mental state" on the part of State Farm. *Sexson*, 61 F. App'x at 271 (citing *Colley*, 691 N.E.2d at 1261). At her deposition, Clifford only identified one possible instance of bad treatment from State Farm - an instance in which Lucas hung up on her. Clifford said it was possible that Lucas had called her back immediately and left her a voice mail message. Clifford does not identify any consequence that resulted from the phone being hung up. Even if Lucas hung up on Clifford and did not call her back, this conduct alone does not rise to the level of fraud, gross negligence, or oppressiveness. Clifford stated that Lucas hung up on her before she hired Starkes in mid-November 2008. There is ample evidence that State Farm continued to communicate with Clifford after that time, through her attorneys, about her claim. Clifford also stated in her deposition that she could not recall other instances in which State Farm treated her poorly. Thus, Clifford does not have evidence that State Farm handled her claim with conscious wrongdoing, dishonest purpose, moral obliquity, furtive design, or ill will, so her claim for bad faith will be dismissed.

B.      *Punitive damages*

As explained above, Clifford's tort claim for bad faith will be dismissed. Clifford's remaining claim is for breach of contract and punitive damages cannot be awarded under a breach of contract action. *Allstate Ins. Co. v. Hennings*, 827 N.E.2d 1244, 1250 (Ind. Ct. App. 2005). Even more, punitive damages are only appropriate when an insurer has acted with "malice, fraud, gross negligence, or oppressiveness which was not the result of a mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing." *Id.* Malice or oppressive conduct can be inferred when an insurance company has no reasonable grounds for denying liability. *Mangino*, 419 N.E.2d at 983. Clifford argues that State Farm's denial letter constituted fraud or gross negligence because it indicated that Clifford procured arson of her property. (Pl.'s Resp. Br. at 21.) However, as discussed above, State Farm had a rational basis for investigating and finding that Clifford procured arson of her property so these actions cannot provide a basis for a finding of bad faith. *Colley*, 691 N.E.2d at 1261; *Malone v. ReliaStar Life Ins. Co.*, 558 F.3d 683, 695 (7th Cir. 2009). Further, Clifford does not have clear and convincing evidence of any other act from which a jury could find that State Farm acted with malice, fraud, gross negligence, or oppressiveness.

C.      *Attorney Fees*

Clifford argues that she may be able to recover attorney fees under INDIANA CODE § 34-52-1-1(b)(3) that allows attorney fees if a party litigated an action in bad faith. (Pl.'s Mem. at 29.) Clifford argues that a denial of coverage in bad faith can lead to a finding that an insurer litigated an action in bad faith. (*Id.* (citing *Patel v. United Fire &*

*Cas. Co.*, 80 F. Supp. 2d 948, 963 (N.D. Ind. 2000)).) As explained above, this court has determined that Clifford does not have evidence showing that State Farm denied her claim in bad faith. She has also not produced other evidence that State Farm litigated this action in bad faith. Thus, State Farm's motion for summary judgment on Clifford's claim for attorney fees will be granted.

IV.     **CONCLUSION**

For the foregoing reasons State Farm's motion for partial summary judgment (DE # 10) is **GRANTED**. Clifford's claims of bad faith, failure to act in good faith, punitive damages, and attorney fees are **DISMISSED**. The case will proceed on Clifford's claim for breach of contract.

**SO ORDERED.**

Date: June 7, 2011

s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT